**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

AUG 13 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

SANTA JERONIMO DE RAMOS; D. R.-J.,

Petitioners,

v.

TODD BLANCHE, Attorney General,

Respondent.

No. 25-436

Agency Nos. A245-031-058
A245-031-059

MEMORANDUM[*]

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 5, 2025
San Francisco, California

Before: BERZON, R. NELSON, and COLLINS, Circuit Judges.

Memorandum joined by Judge R. NELSON and Judge COLLINS;
Dissent by Judge BERZON

Santa Jeronimo de Ramos and her minor daughter, natives and citizens of

Guatemala, petition for review of a decision of the Board of Immigration Appeals

("BIA") upholding an order of an Immigration Judge ("IJ") denying Jeronimo de

Ramos's application for asylum, withholding of removal, and protection under the

Convention Against Torture ("Torture Convention").[1]  We have jurisdiction under

---

[*] This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

[1] Jeronimo de Ramos's daughter did not file a separate application for relief and
was listed as a derivative beneficiary on Jeronimo de Ramos's application only for

§ 242 of the Immigration and Nationality Act, 8 U.S.C. § 1252, and we deny the petition.

1. Substantial evidence supports the agency's determination that Jeronimo de Ramos was not credible. *See Garland v. Ming Dai*, 593 U.S. 357, 373 (2021) (holding that a court of appeals "must accept the agency's findings of fact," including adverse credibility determinations, "as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary'" (quoting 8 U.S.C. § 1252(b)(4)(B)).

In particular, the agency reasonably concluded that Jeronimo de Ramos's claim that she knew very little Spanish was contradicted by other record evidence, including (1) her statement in her asylum applications (Forms I-589) that she speaks "Spanish" "fluently"; (2) her ability to participate in a psychological evaluation with a doctor, who "interviewed her in Spanish for approximately two hours"; and (3) her testimony that she understood key portions of what her alleged persecutors said to her in Spanish back in Guatemala, including a telephone conversation concerning extortion. The agency was not required to accept Jeronimo de Ramos's explanation that she had acquired only a limited facility in Spanish watching television growing up in Guatemala and that her Spanish had

---

purposes of asylum. *See Ali v. Ashcroft*, 394 F.3d 780, 782 n.1 (9th Cir. 2005) (stating that, unlike asylum, withholding of removal and relief under the Torture Convention "may not be derivative").

2

improved since arriving in the United States a year before the hearing.

Moreover, the agency reasonably concluded that Jeronimo de Ramos's credibility was undercut by the significant discrepancies in her statements regarding the amount of money that was demanded in an alleged extortion incident. Between her original I-589, amended I-589, and merits hearing testimony, Jeronimo variously claimed that the extortioner demanded 1,000 quetzales, 6,000 quetzales, and 100,000 quetzales. The agency also permissibly concluded that Jeronimo de Ramos's claim that the local auxiliaries in Guatemala did not speak Spanish and therefore could not contact the police on her behalf was inconsistent with the Spanish-language letters purportedly written by the auxiliaries and submitted by Jeronimo de Ramos to the court. The agency was not required to accept her explanation that the various problems in her testimony were attributable to trauma, as reflected in the psychological report she submitted, or to a lack of education.

"[A]ssessing the totality of the circumstances," we conclude that these three key grounds suffice to sustain the agency's adverse credibility determination concerning Jeronimo de Ramos, without the need to consider or rely on the remaining grounds provided by the agency and challenged by Jeronimo de Ramos here. *Alam v. Garland*, 11 F.4th 1133, 1137 (9th Cir. 2021) (en banc).

2. The agency reasonably concluded that the remaining evidence in the

record did not warrant a conclusion that Jeronimo de Ramos was eligible for asylum or withholding of removal.

The agency permissibly held that the testimony of Jeronimo de Ramos's husband was also lacking in credibility. In particular, her husband's claim that "she only understands very few words" of Spanish was reasonably deemed to be "wholly inconsistent" with the record evidence noted earlier. As to the letters and affidavits submitted by Jeronimo de Ramos, the agency reasonably concluded that these documents were "entitled to limited weight" on the grounds that, *inter alia*, the authors were not "available for cross-examination," *Mukulumbutu v. Barr*, 977 F.3d 924, 927 (9th Cir. 2020); the authors had not witnessed the actual alleged attacks, *see Garcia v. Holder*, 749 F.3d 785, 791 (9th Cir. 2014); and "the authenticity of the documents relied on [the petitioner's] discredited testimony," *id*.

The agency also reasonably concluded that the country conditions evidence did not suffice to carry Jeronimo de Ramos's burden with respect to either asylum or withholding of removal. Substantial evidence supports the BIA's determination that Jeronimo de Ramos's disfavored group claim fails, given the inadequacy of her evidence of an asserted individualized risk of future harm based on her identity as an indigenous Guatemalan woman. *See Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004) (stating that, under a "disfavored group" analysis, the applicant must present evidence of "membership in a 'disfavored group' *and* an individualized

4

risk of being singled out for persecution" (emphasis added)).

Jeronimo de Ramos notes that the BIA's decision does not explicitly mention the IJ's rejection of her reliance on a "pattern or practice" theory, which does not require a showing that the applicant "would be singled out individually for persecution."  8 C.F.R. § 1208.13(b)(2)(iii); *see also Wakkary v. Holder*, 558 F.3d 1049, 1060–61 (9th Cir. 2009).  But in both the BIA's initial summary of the IJ's analysis of the non-testimonial evidence and the BIA's ultimate conclusion that the IJ's analysis was correct, the BIA cited and relied on the pages of the IJ's analysis that address the pattern-or-practice issue, and we construe its decision as upholding the IJ's determination on that point.  Substantial evidence supports the IJ's conclusion that Jeronimo de Ramos did not carry her burden to establish the requisite pattern or practice.  On this record, the IJ reasonably concluded that, "while the indigenous community is certainly discriminated against and marginalized more so than the non-indigenous community in Guatemala, [Jeronimo de Ramos] has not established that the threat of persecution against the indigenous community or indigenous females is so serious and widespread that she has a well-founded fear of future persecution by virtue of the fact that she is an indigenous Guatemalan female." *See also Wakkary*, 558 F.3d at 1061 (upholding agency finding of no pattern or practice of persecution, noting that evidence of "widespread" discrimination against members of a group, or evidence that a

"certain portion" of that group experiences persecution, does not necessarily establish a "pattern or practice").

3. Substantial evidence supports the agency's denial of relief under the Torture Convention. Apart from reiterating points that we have already rejected, Jeronimo de Ramos's opening brief makes no effort to explain why the BIA erred in upholding the IJ's finding that she had failed to show that "any future torture would occur by, or with the consent or acquiescence of, a public official even if she were credible." Any challenge to that point is therefore forfeited. *See Hernandez v. Garland*, 47 F.4th 908, 916 (9th Cir. 2022). And because that "state action" point is sufficient to support the denial of relief under the Torture Convention, *see Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014), the agency properly denied such relief.

**PETITION DENIED.**

*Jeronimo de Ramos v. Blanche*, No. 25-436

BERZON, Circuit Judge, dissenting:

I respectfully dissent. In my view, substantial evidence does not support enough of the BIA's reasons for upholding the IJ's adverse credibility determination against Jeronimo de Ramos that we can sustain the determination based on the "totality of the circumstances and all relevant factors." *Alam v. Garland*, 11 F.4th 1133, 1137 (9th Cir. 2021) (en banc) (brackets omitted) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). That adverse credibility determination was dispositive of the merits of Jeronimo de Ramos's claims. We should have remanded for the BIA to reconsider the IJ's credibility ruling.

1.      Several of the supposed inconsistencies in Jeronimo de Ramos's testimony central to the BIA's credibility decision were not inconsistencies at all. An "alleged inconsistency does not support an adverse credibility determination [if] it is not, in fact, inconsistent." *Barseghyan v. Garland*, 39 F.4th 1138, 1143 (9th Cir. 2022).

(a)      The BIA held Jeronimo de Ramos's testimony that she did not know much Spanish "inconsistent with a psychological evaluation of [her], which indicates that a doctor 'interviewed her in Spanish for approximately two hours.'" But the evaluation occurred in the United States, a year after her arrival. The fact that the interview took place in Spanish is not inconsistent with Jeronimo de

1

Ramos's testimony that she became more familiar with Spanish after coming to America.

(b)     The BIA relied on the finding that Jeronimo de Ramos's claim during the hearing "that a trespasser her son found on their property called for him was omitted from her declaration." This live testimony "supplemented rather than contradicted" the account of the incident in her declaration; it was not inconsistent with that account. *Iman v. Barr*, 972 F.3d 1058, 1068 (9th Cir. 2020).

(c)     The BIA also characterized Jeronimo de Ramos's testimony that the auxiliary officials lacked police power as inconsistent with evidence that witnesses had called those officials each time she was attacked. That the auxiliaries do not have the power to arrest is hardly inconsistent with their being called upon to respond to community disturbances. Many such groups exist in the United States— in some cities they might be called a neighborhood watch; in others, the Guardian Angels.[1]

2.     The BIA impermissibly upheld several of the IJ's credibility findings based on "[s]peculation and conjecture," which "cannot form the basis of an adverse credibility finding." *Shah v. Immigr. & Naturalization Serv.*, 220 F.3d 1062, 1071 (9th Cir. 2000).

---

[1] *See* Michael Wilson, *Guardian Angels Seek Out More Mean Streets*, N.Y. Times (Mar. 22, 2007), https://www.nytimes.com/2007/03/22/nyregion/22guardians.html [https://perma.cc/H4GT-NCJH].

(a)     The BIA agreed with the IJ that it was "implausible [the witnesses] would contact the [auxiliary] office . . . if it lacked relevant power." No record evidence independently establishes that the auxiliaries had police power. In fact, the auxiliaries' letters suggest the opposite. Those letters report only that the members of the auxiliaries "went to see what had happened." After observing that "there was no one," they did nothing else. As in *Quan v. Gonzales*, 428 F.3d 883, 887 (9th Cir. 2005), in which this court rejected an IJ's speculation about "police capabilities," the BIA and IJ reached their conclusions by speculating, without an evidentiary basis, as to the auxiliaries' authority.

(b)     The BIA affirmed the IJ's finding that Jeronimo de Ramos's "decision to leave two of her three children behind in Guatemala was implausible given her claim that they were subjects of the most recent threats she received." This speculative finding disregards the evidentiary record. Jeronimo de Ramos testified that she did not have money to bring all three children to the United States. It also disregards that she brought her daughter with her, not her sons. Given the asserted risk of persecution in Guatemala against indigenous women, she could have sensibly brought her daughter instead of her sons when she lacked the funds to bring them all, believing the daughter was in more danger. Instead of considering Jeronimo de Ramos's explanation, the agency improperly engaged in "speculation and conjecture about what someone in [the petitioner's] position would or would

3

not do." *Chawla v. Holder*, 599 F.3d 998, 1006 (9th Cir. 2010).

(c)     The BIA also agreed with the IJ that Jeronimo de Ramos had likely lied about her Spanish skills because she otherwise would not have been "able to understand much of what the men she claims tried to harm her said in Spanish." This conclusion was partially based on the unsupported assumptions that (1) Jeronimo de Ramos could not have learned enough Spanish from watching television to understand the threats and (2) someone with limited Spanish proficiency could not, "under stressful and traumatic conditions[,] . . . have been able to understand and testify to all of the statements her persecutor[s] made to her in Spanish."

Contrary to the IJ's description, Jeronimo de Ramos did not testify to having "entire telephonic conversations" with her attackers. Rather, she recounted that she answered the phone, was briefly threatened with extortion, and then hung up. She also testified that she understood Spanish better than she could speak it. Jeronimo de Ramos testified that she learned Spanish over an eight-year period, including from news coverage of crime. It is plausible that someone who watched Spanish-language crime news over the better part of a decade could have understood the gist of her attackers' threats. "Because the IJ's skepticism as to the plausibility of [Jeronimo de Ramos's] testimony was based on a mischaracterization of that testimony, such skepticism did not provide a proper basis for upholding the

4

adverse credibility finding." *Chawla*, 599 F.3d at 1008.

3. The BIA "ignor[ed] documents consistent with [Jeronimo de Ramos's] testimony." *Barseghyan*, 39 F.4th at 1146.

(a) The BIA improperly concluded that the statements from three people who responded to the attacks on Jeronimo de Ramos were entitled to little weight because those individuals did not witness the attacks. In fact, although the individuals did not see the attacks in progress, two heard her during the attacks, and each saw Jeronimo de Ramos or her children in distress immediately afterward. Miguel Mendoza Calmo stated that he heard Jeronimo de Ramos "asking for help," that he saw her "crying and afraid," and that his dog "scared [the assailants] off and they left." Rony Mendoza Ramos stated that he "heard screams," saw "her children crying with fear," and saw that "she had injured her foot." And Jose Guadalupe Ramos Martin stated that when he "went to see what had happened," he found Jeronimo de Ramos "afraid and asking for help." Those accounts were meaningfully corroborative of Jeronimo de Ramo's credibility and should have been taken into account.

(b) The BIA also discounted the witnesses' statements because they were not authenticated and therefore not "high quality." But "failure to authenticate documents, at least in the absence of evidence undermining their reliability, does not constitute a sufficient foundation for an adverse credibility finding." *Shire v.*

*Ashcroft*, 388 F.3d 1288, 1299 (9th Cir. 2004).

(c)     Likewise, although Jeronimo de Ramos's husband had been in the United States when the attacks occurred, he testified at the hearing that she had told him about the incidents shortly after they occurred. Evidence that Jeronimo de Ramos had contemporaneously reported the attacks to others was corroborative of her testimony.

4.     The majority declines to address many of the credibility factors relied upon by the BIA because it concludes that "three key grounds suffice to sustain the agency's adverse credibility determination . . . without the need to consider or rely on the remaining grounds provided by the agency": inconsistencies concerning Jeronimo de Ramos's Spanish proficiency, the auxiliaries' Spanish proficiency, and the amount of money demanded by her extorters. Majority at 2–3.

As I have explained, substantial evidence does not support the first of these grounds, and the BIA's credibility ruling overall rested predominantly on numerous factors not supported by the record. Review of an adverse credibility determination "will always require assessing the totality of the circumstances" and "'*all* relevant factors.'" *Alam*, 11 F.4th at 1137 (emphasis added) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). Where, as here, the agency both relies on a great many invalid factors and erroneously declined to consider substantial corroborating evidence, the basic structure of its credibility determination becomes

6

fundamentally undermined. Under such circumstances, the proper course of action is to "remand to the BIA to determine in the first instance whether the remaining factors—considered on their own," and in light of the corroborating evidence—"suffice to support an adverse credibility determination." *Kumar v. Garland*, 18 F.4th 1148, 1156 (9th Cir. 2021).

I would grant the petition and remand on this ground. If the BIA ruled on remand that the IJ's adverse credibility determination had been erroneous, the IJ would need to reconsider his rulings that Jeronimo de Ramos had not suffered past persecution and that the Guatemalan government was willing and able to protect her. *See Barseghyan*, 39 F.4th at 1146. I therefore would not reach at this time the other issues the majority addresses.